**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1262**

MATEUSZ FIJALKOWSKI,

Plaintiff − Appellant,

v.

M. WHEELER; S. ADCOCK; S. BLAKELY; R. BRONTE-TINKEW; C. CLARK; J. GRANDE; R. JAKOWICZ; L. LABARCA; L. MCNAUGHT; W. MULHERN; M. ZESK,

Defendants – Appellees,

and

AMERICAN POOL INC.; SEAN BROOKS,

Defendants.

----------------------------------

WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS; THE RUTHERFORD INSTITUTE,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. T. S. Ellis, III, Senior District Judge. (1:18-cv-00492-TSE-MSN)

Argued: November 13, 2019                    Decided: March 9, 2020

Before MOTZ, DIAZ, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Motz and Judge Harris joined.

**ARGUED:** Victor M. Glasberg, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant. Kimberly Pace Baucom, FAIRFAX COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellees. **ON BRIEF:** Bernadette E. Valdellon, VICTOR M. GLASBERG & ASSOCIATES, Alexandria, Virginia, for Appellant. Karen Gibbons, Elizabeth Teare, FAIRFAX COUNTY ATTORNEY'S OFFICE, Fairfax, Virginia, for Appellees. Jonathan Smith, Hannah Lieberman, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS, Washington, D.C.; Carter G. Phillips, Mark P. Guerrera, David E. Kronenberg, Justin A. Benson, Joshua Moore, SIDLEY AUSTIN LLP, Washington, D.C. for Amicus Washington Lawyers' Committee for Civil Rights and Urban Affairs. John W. Whitehead, Douglas R. McKusick, THE RUTHERFORD INSTITUTE, Charlottesville, Virginia, for Amicus The Rutherford Institute.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Mateusz Fijalkowski brought this action under 42 U.S.C. § 1983 and state law, arguing, as relevant here, that Fairfax County, Virginia police officers violated his Fourteenth Amendment substantive due process rights when they delayed—for up to two-and-a-half minutes—a lifeguard from rescuing him from drowning in a swimming pool. He also alleges that the officers were grossly negligent under Virginia law when they delayed his rescue and otherwise failed to assist him. The district court dismissed these claims, concluding that the officers were entitled to qualified immunity on the substantive due process claim and that Fijalkowski failed to state a gross negligence claim. For the reasons that follow, we affirm.

I.

On May 23, 2016, twenty-three-year-old Mateusz Fijalkowski arrived in the United States from his home country, Poland, to work for the summer.[1] Three days later, Fijalkowski began working as a pool attendant at Riverside Apartments in Fairfax County, Virginia. He was trained to clean the pool, check the pH level of the water, and arrange

---

[1] Because this case comes to us on appeal from the grant of a motion to dismiss, we accept the facts alleged in the complaint as true and draw all reasonable inferences in Fijalkowski's favor. *See Hamilton v. Pallozzi*, 848 F.3d 614, 620 (4th Cir. 2017).

the deck chairs. He wasn't trained to perform lifeguarding duties, and he didn't know how to swim.

On May 30, 2016, Fijalkowski began acting irrationally at work. He argued with guests over the colored wristbands required to enter the pool area, and he grabbed a young woman by the arm and ripped off her wristband. He also began talking to himself in Polish and walking around the pool without purpose, appearing distressed.

A lifeguard on duty that day, Sean Brooks, called the police, and Fairfax County police officers arrived shortly thereafter. Brooks told the officers about Fijalkowski's behavior and that he appeared to be experiencing a mental health crisis. Brooks also told them that Fijalkowski couldn't swim. The complaint further alleges that the officers "were aware that [Fijalkowski] was a supposed lifeguard who did not know how to swim and who was experiencing a serious mental health breakdown, making himself a potential risk of harm to himself and others at the pool." J.A. 12.

The officers attempted to communicate with Fijalkowski, but he blew his whistle and continually moved away from them. The officers directed all pool patrons to leave and locked the fence that surrounded the pool. Only Fijalkowski, Brooks, and the officers remained inside the fenced-in pool area. The officers called a Polish-speaking officer and Fijalkowski's Polish roommate to the pool to attempt to communicate with him. One of the officers was trained in crisis intervention, but he and the others were unable to communicate with Fijalkowski, who didn't acknowledge them.

Fijalkowski continued to act erratically. He paced around the pool and talked to himself. He threw his cell phone into the deep end of the pool and walked in to recover it,

4

submerging himself in the process. He soon emerged from the pool, but he then threw his cell phone into the deep end a second time. Again, he walked into the pool to recover it, submerged himself, and then emerged. He also climbed into a lifeguard tower and shouted and blew his whistle. The officers continued to attempt to communicate with him, but he didn't respond.

Fijalkowski then went to the ladder at the shallow end of the pool and stood calmly and silently for about one minute.[2] He entered the pool again, going to the deep end and submerging himself. Brooks and the officers stood around the pool and watched him. After some period of time, Fijalkowski grabbed onto the pool's drain cover and struggled not to surface. He vomited, and after about a minute and twenty-two seconds, he released the air retained in his lungs. Eventually, he stopped moving. Brooks and the officers continued to watch him, though they knew that he was at risk of drowning after he had been submerged for thirty seconds and had released the air from his lungs.

At some point, Brooks told the officers that he needed to rescue Fijalkowski. Brooks was able and equipped to do so, but the officers ordered Brooks not to enter the pool. After Fijalkowski had been submerged for approximately two-and-a-half minutes, Brooks again told the officers that he needed to rescue him, and (this time) the officers allowed him to do so. Brooks dove into the pool and brought Fijalkowski to the surface. Several of the officers jumped in to help remove him from the water.

---

[2] At this time, a bystander began videotaping the incident. The contents of the video are incorporated into the complaint by reference, so we consider them here. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011).

Once Fijalkowski was out of the pool, the officers performed lifesaving measures. Emergency medical technicians arrived and used a ladder to climb over the locked pool fence to reach Fijalkowski. They found that he wasn't breathing and didn't have a pulse. They applied an automatic external defibrillator to his chest. This revived him, and he was transported to the hospital.

Fijalkowski remained in the hospital's heart and vascular unit for just over a week. He was then transferred to the psychiatric unit, where he was diagnosed with bipolar disorder and psychosis. He was discharged from the hospital six days later and returned to Poland.

Fijalkowski filed suit against the officers, Brooks, and Brooks's employer, seeking damages under 42 U.S.C. § 1983 and state law. As relevant here, Fijalkowski alleges that the officers violated his Fourteenth Amendment substantive due process rights when they delayed Brooks's rescue efforts and that they were grossly negligent under Virginia law when they delayed his rescue and otherwise failed to assist him.[3] The defendants moved to dismiss the complaint, and the district court granted the motion, concluding, in relevant part, that the officers were entitled to qualified immunity and that Fijalkowski failed to state a claim of gross negligence. This appeal followed.

---

[3] Fijalkowski also alleges that the officers violated his substantive due process rights when they failed to prevent him from entering the pool. The district court dismissed this allegation for failure to state a claim. The court also dismissed Fijalkowski's claims against Brooks and Brooks's employer. Fijalkowski does not appeal these rulings.

II.

We first consider the district court's dismissal of Fijalkowski's substantive due process claim on the ground that the officers were entitled to qualified immunity. "We review a qualified immunity-based motion to dismiss de novo." *Tobey v. Jones*, 706 F.3d 379, 385 (4th Cir. 2013).

A.

Qualified immunity shields state officials from civil liability under § 1983 "unless their actions violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pinder v. Johnson*, 54 F.3d 1169, 1173 (4th Cir. 1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Determining whether a state officer is entitled to qualified immunity is a two-step inquiry." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). First, we consider "whether a constitutional right would have been violated on the facts alleged." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 200 (2001)). Second, "assuming that the violation of the right is established," we "consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Id.* (quoting *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002)). We may consider the steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

To determine whether a right was clearly established, we consider whether controlling authority, or a "robust consensus of persuasive authority," *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017) (internal quotation marks omitted), would have given the officers "'fair warning that their conduct,' under the circumstances, 'was

7

wrongful,'" *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019) (internal quotation marks omitted) (quoting *Williamson v. Stirling*, 912 F.3d 154, 187 (4th Cir. 2018)). We must define the right allegedly violated "at a high level of particularity." *Braun v. Maynard*, 652 F.3d 557, 562 (4th Cir. 2011) (quoting *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007)).

Although this standard "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). However, "when 'the defendants' conduct is so patently violative of [a] constitutional right that reasonable officials would know without guidance from the courts' that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." *Clem v. Corbeau*, 284 F.3d 543, 553 (4th Cir. 2002) (quoting *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994)).[4]

B.

Fijalkowski contends that the officers violated his substantive due process rights when they ordered Brooks not to enter the pool to rescue him. Fijalkowski relies on the state-created danger doctrine, which holds that state actors are liable under the Due Process Clause when they "created or increased the risk of private danger, and did so directly

---

[4] To emphasize the point, Fijalkowski directs us to our recent decision in *Ray v. Roane*, 948 F.3d 222 (4th Cir. 2020). We agree with *Ray* that "directly on-point, binding authority" is not required where "the right was clearly established based on general constitutional principles," *id.* at 229 (quoting *Booker*, 855 F.3d at 543), and we apply that principle here.

8

through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). We decline to resolve whether the officers' conduct constitutes a substantive due process violation under the state-created danger doctrine. Rather, we agree with the district court that even if it does, the officers are entitled to qualified immunity because it was not clearly established at the time of the incident that delaying by up to two-and-a-half minutes[5] the rescue of a drowning person who may have posed a danger to others violated that person's substantive due process rights.

The parties have identified no controlling authority placing the constitutionality of the officers' conduct beyond debate, and we agree that there is none. But this doesn't end our inquiry; a "robust consensus of persuasive authority" may also clearly establish the right allegedly violated. *Booker*, 855 F.3d at 544 (internal quotation marks omitted). Fijalkowski offers no such robust consensus. The officers, for their part, point to three cases from our sister circuits addressing alleged substantive due process violations by officers who prevented the rescue of drowning persons. The officers contend that together, these cases fail to provide a consensus, let alone a robust consensus, that would have given them fair warning that their conduct violated Fijalkowski's substantive due process rights. We agree.[6]

---

[5] It is not clear from the complaint or the video when Brooks first sought to rescue Fijalkowski. If Brooks did so immediately after Fijalkowski entered the water, the officers would have delayed his rescue for a maximum of two-and-a-half minutes.

[6] The officers also highlight three other cases addressing alleged substantive due process violations by officers who interacted with suicidal persons. Appellees' Br. at 24–26. Because these cases neither found violations nor involved the delay of rescue efforts

9

The first of the factually similar cases is *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990). In *Ross*, a twelve-year-old boy fell into a lake and sank. *Id.* at 1424. Within ten minutes, two lifeguards, two firefighters, and one police officer arrived on the scene to conduct a rescue. *Id.* In addition, two nearby civilians with a boat and scuba diving equipment offered to assist in the rescue. *Id.* Despite these resources, a county deputy sheriff ordered all rescue efforts to stop because, under a county policy, only divers from the city fire department were authorized to rescue someone drowning in the lake. *Id.* at 1424–25. When the civilians offered to attempt the rescue at their own risk, the deputy sheriff threatened to arrest them and positioned his boat to prevent them from entering the water. *Id.* at 1425. Authorized city divers did not arrive until the boy had been underwater for thirty minutes. *Id.* They pulled him from the water, but he later died. *Id.*

Addressing the deputy sheriff's conduct, the Seventh Circuit stated that "a citizen in peril for his life ha[s] a constitutional right that prevent[s] a police officer from cutting off private avenues of lifesaving rescue without providing an alternative." *Id.* at 1432. The court also held that the right was clearly established at the time of the incident. *Id.* The court so held because "a fundamental tenet of [its] constitutional jurisprudence" is that "the state cannot arbitrarily assert its power so as to cut short a person's life." *Id.* at 1433. Applying that principle to the record facts, the court concluded that a reasonable officer in the deputy sheriff's position would have known that he could not arbitrarily use his

without providing an alternative, we agree with the officers that the cases would not have given them fair warning that their conduct here was unlawful.

10

authority to prevent private rescue efforts. *Id.* The court explained that "[t]here was simply no rational reason for [the deputy sheriff] to prefer 'authorized' but equally competent rescuers located away from the scene." *Id.*

The next factually similar case is *Andrews v. Wilkins*, 934 F.2d 1267 (D.C. Cir. 1991), *abrogation on other grounds recognized by Atchinson v. District of Columbia*, 73 F.3d 418, 421 (D.C. Cir. 1996). There, Andrews jumped into the Washington Channel as a police officer attempted to arrest him. *Id.* at 1269. Andrews swam across part of the Channel but then turned back towards the shore and began to tire. *Id.* The officer attempted to throw a life ring to Andrews, but it didn't reach him. *Id.* Officers then saw a private boat approaching, and they hailed the boat to assist in rescuing Andrews. *Id.* After reaching Andrews, the boat owner told the officers that she needed to enter the water to rescue him and that she had been trained to do so. *Id.* However, the officers directed her not to enter the water, stating that Andrews was an escaped prisoner and could be dangerous. *Id.* Approximately thirty minutes later, official rescuers arrived and pulled Andrews from the water. *Id.* He was later pronounced dead. *Id.*

The D.C. Circuit recognized that *Ross* "held that police action deliberately or recklessly interfering with ongoing private rescue efforts may establish a constitutional tort." *Id.* at 1270. However, the D.C. Circuit found the facts in *Andrews* "much less troubling than those in *Ross*." *Id.* at 1271. Among other things, the court noted that the officers in *Andrews* "were concerned with Andrews's bizarre behavior." *Id.* In addition, the court concluded that even if the officers violated Andrews's substantive due process rights when they interfered with the private rescue effort, the right was not clearly

11

established "in a particularized sense." *Id.* (alterations adopted) (quoting *Brogsdale v. Barry*, 926 F.2d 1184, 1191 (D.C. Cir. 1991)). It explained:

> While it should have been clear to the police that they could not "arbitrarily assert their power so as to cut short a person's life," it certainly could not have been clear to them that they were required to refrain from taking any action when a private citizen, drawn into a police rescue operation, was about to expose herself to substantial danger, of which she was not completely aware.

*Id.* (internal citation omitted and alteration adopted) (quoting *Ross*, 910 F.2d at 1433).

The final factually similar case is *Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000) (unpublished). In *Beck*, a man jumped or fell from a bridge into a river. *Id.* at *1. City police officers and the city's director of public safety arrived a few minutes later. *Id.* In addition, members of a group of trained civilian divers heard a report of the incident and went to the scene to assist in the rescue. *Id.* The volunteer divers told the public safety director that they were prepared to attempt a rescue. *Id.* However, the public safety director instructed them not to enter the water because, pursuant to a joint city and county policy, only the county dive team was authorized to conduct underwater rescues. *Id.* The county dive team arrived thirty-five minutes after the volunteer divers had offered to attempt a rescue. *Id.* at *2. They pulled the man from the water and attempted to resuscitate him, but he later died. *Id.*

The Sixth Circuit agreed with *Ross* that "official action preventing rescue attempts by a volunteer civilian diver can be arbitrary in a constitutional sense if a state-sponsored alternative is not available when it counts." *Id.* at *4. The court stated that *Ross* "pointed to" the conclusion that the public safety director's conduct was unconstitutional, but it held

12

that even if it was, he was entitled to qualified immunity because no Supreme Court or Sixth Circuit precedent clearly established that the Sixth Circuit would follow *Ross*. *Id.* at *7.

We agree with the officers that these cases do not amount to a robust consensus of persuasive authority that would have given them fair warning that their conduct violated Fijalkowski's substantive due process rights. Only *Ross* expressly held that an officer violated a drowning person's substantive due process rights by preventing private rescue efforts without providing an alternative. *Beck* merely suggested that the public safety director did so. One case is not a robust consensus of persuasive authority.

Moreover, the facts in *Ross* and *Beck* are distinct from those here in two key respects. First, the officer in *Ross* and the public safety director in *Beck* prevented the private rescue efforts for approximately thirty and thirty-five minutes, respectively. Second, neither the officer in *Ross* nor the public safety director in *Beck* had reason to believe that the drowning persons posed a danger to others. These cases would not have given the officers here fair warning that delaying Fijalkowski's rescue for up to two-and-a-half minutes, knowing that he may pose a danger to others, violated his substantive due process rights.

The circumstances here are closer to those in *Andrews*. There, the officers were concerned with Andrews's bizarre behavior, and, although the private rescuer said she had

13

rescue training, they believed that he posed a danger to her. And there, the court suggested that the officers' conduct did not rise to the level of that found unconstitutional in *Ross*.[7]

Accordingly, *Ross*, *Beck*, and *Andrews* would not have given the officers fair warning that delaying Fijalkowski's rescue under the circumstances here violated his substantive due process rights.

But this doesn't end our inquiry. Fijalkowski insists that the officers' conduct so patently violated the fundamental principle that "the state cannot arbitrarily assert its power so as to cut short a person's life," *Ross*, 910 F.2d at 1433, that objectively reasonable officers would have known their conduct was unconstitutional even without closely analogous case law. We cannot agree.

Looking to the facts alleged in the complaint, we cannot say that the officers' conduct amounted to a patently arbitrary assertion of power. True, the complaint alleges that the officers knew that Fijalkowski was at risk of drowning after being submerged for thirty seconds and that Brooks was able and equipped to rescue him. But the complaint also alleges that the officers were aware that Fijalkowski's inability to swim and his mental state made him a risk of danger to others. And, they had seen him enter and exit the pool twice before on his own. Unlike in *Ross*, where "[t]here was simply no rational reason" for the officer to prevent the rescue efforts, *id.*, here there were such reasons. And

---

[7] The officers in *Andrews* were also concerned that the private rescuer didn't know of the danger Andrews may have posed, while here, Brooks knew of Fijalkowski's erratic behavior, mental state, and inability to swim. But, given the similarities that remain, we don't think this difference would have given the officers fair warning that their conduct was unconstitutional.

14

ultimately, the officers allowed Brooks to rescue Fijalkowski after (at most) two-and-a-half minutes, far less than the amount of time that had elapsed in *Ross*, *Beck*, and *Andrews*.

Accordingly, the complaint doesn't allege conduct that amounts to a patently arbitrary assertion of power to cut short Fijalkowski's life. And this is so, even as we are mindful that at the motion to dismiss stage, we may not draw inferences against Fijalkowski. We are also mindful that the rationale for the officers' conduct isn't alleged in the complaint, and we don't make any inferences about that rationale here. We only conclude that on its face, the complaint alleges facts belying the contention that the officers' conduct was a patently arbitrary assertion of power.

We therefore affirm the district court's dismissal on qualified immunity grounds of Fijalkowski's substantive due process claim.

III.

We next consider the district court's dismissal of Fijalkowski's gross negligence claim. "We review de novo the grant of a motion to dismiss for failure to state a claim." *Bonds v. Leavitt*, 629 F.3d 369, 385 (4th Cir. 2011).

A.

Under Virginia law, gross negligence is "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016) (quoting *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004)). "Because 'the standard for gross negligence in Virginia is one of indifference, not

15

inadequacy,' a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Id.* (alterations adopted) (quoting *Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008) (unpublished) (per curiam)). Ordinarily, the question of whether gross negligence has been established is a matter for the jury. *Id.* However, when no reasonable juror could find that gross negligence has been established, the court must dismiss the claim. *Id.*

## B.

On appeal, Fijalkowski draws our attention to the officers' conduct after he submerged himself for the third time and argues that this conduct amounts to gross negligence under Virginia law.

We disagree and conclude that the facts alleged in the complaint show that the officers exercised some degree of care during that time.[8] In particular, the officers came to the deep end of the pool and monitored Fijalkowski, they eventually permitted Brooks to rescue him, and they also assisted in the rescue. Even if they waited too long to do so, we agree with the district court that the claim is one of inadequacy, not indifference.

Accordingly, we affirm the district court's dismissal of Fijalkowski's gross negligence claim.

## IV.

---

[8] As a result, we need not address the officers' arguments that Fijalkowski can't recover damages because he committed the common law crime of attempted suicide and that they aren't liable because they didn't owe Fijalkowski a special duty.

16

For the reasons given, the district court's dismissal of Fijalkowski's complaint is

*AFFIRMED.*